1  SNYDER ♦ DORENFELD, LLP
   David K. Dorenfeld, (State Bar No. 145056)
2  Michael W. Brown, (State Bar No. 205380)
   5010 Chesebro Road
3  Agoura Hills, CA 91301
   Telephone:  (818) 865-4000
4  Facsimile:   (818) 865-4010
   Emails: DavidD@sd4law.com
5          MichaelB@sd4law.com

6  CATHY JACKSON LERMAN, PA
   Cathy J. Lerman
7  #118, 1440 Coral Ridge Drive
   Coral Springs, FL 33071
8  Telephone: (954)332-1143
   Facsimile:  (800) 305-2351
9  Email: clerman@lermanfirm.com

10  Attorneys for Plaintiff

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13  EMMANUEL "MANNY" GRANT, individually and )   Case No.:
    on behalf of a class of similarly situated persons, )
14                                                    )   **FIRST AMENDED CLASS**
                                                      )   **ACTION COMPLAINT**
15                      Plaintiff,                    )
                                                      )   **JURY TRIAL DEMANDED**
16  v.                                                )
                                                      )
17                                                    )
                                                      )
18  PENSCO TRUST COMPANY, LLC,                        )
                                                      )
19                      Defendant.                    )
                                                      )
20                                                    )
                                                      )
21                                                    )
                                                      )
22  _____)

23

24

25

26

27

28

SNYDER ♦ DORENFELD, LLP

# I.  INTRODUCTION

1.      This is a class action lawsuit involving Self-Directed Investment Retirement Accounts ("SDIRAs").[1]

2.      Plaintiff Emmanuel "Manny" Grant ("Grant") entered into a contract with Defendant PENSCO Trust Company, LLC ("PENSCO," or "Defendant"), through which PENSCO was supposed to serve as a "passive" Custodian for Grant's SDIRA. (The other putative Class Members similarly entered into such a contract as well). Such a custodian fulfills certain administrative and ministerial tasks, purportedly at the direction of the account holder.  However, the law places restrictions and limitations upon who may serve as such a Custodian.  In the case of PENSCO, it could only serve as such a Custodian if it met certain duties pursuant to *Internal Revenue Code* § 408 and 26 C.F.R., 1.408-2.

3.      As will be discussed below, the contract between PENSCO and Plaintiff and the Class Members was illusory and illegal; while PENSCO's role was supposed to be passive, the contract instead provided PENSCO with complete investment discretion and authority over certain assets of its SDIRA account holders.  This discretion and authority rendered the contract illegal from its inception, as discussed in further detail below.  Furthermore, PENSCO failed to properly perform the duties required of it pursuant to *Internal Revenue Code* § 408 and 26 C.F.R., 1.408-2.

---

[1] A SDIRA is an individual retirement account ("IRA") held by a trustee or custodian that permits investment in a broader set of assets than is permitted by most IRA custodians. SDIRA account holders are permitted to invest in a variety of nontraditional investment options of their own choosing, including tax lien certificates, promissory notes, real estate, businesses, and LLCs. SDIRAS are administered by custodians or trustees.  It is estimated that approximately $94 billion was held in SDIRAS in the United States in 2011.

SNYDER ♦ DORENFELD, LLP

4.      To avoid confusion within this complaint, PENSCO will be referred to as a "Trustee/Custodian" and its services will be referred to as "Trustee/Custodian services" as will be explained below.

5.      In this case, Plaintiff and the Class Members were convinced to invest through PENSCO SDIRAs by the Fraud Promoters who sold the illegal investments.[2]  The Fraud Promoters used SDIRAS because they allowed *investment in non-traditional assets*, such as tax lien certificates, promissory notes, real estate, businesses, and LLCs.  In addition, the Fraud Promoters were aware that PENSCO provided a sense of legitimacy to an otherwise fraudulent investment scheme, and helped entice inexperienced and unsophisticated investors to invest their money with unlicensed broker/dealers selling unqualified non-exempt securities.   See Exhibit #1, "SEC Charges Perpetrator of Washington-Area Ponzi Scheme" dated November 18, 2011 wherein the SEC notes that Garfield Taylor, one of the principal fraud promoters in this $27 million Ponzi scheme, targeted middle-class persons with little or no investing experience. (Exhibit #1, pg. 1).

6.      Unbeknownst to the Plaintiff and Class Members, the money they invested in their SDIRAS were "investments" that were fraudulent, illusory or non-existent.  As with all Ponzi schemes, the money of new investors such as Plaintiff and the Class Members was used to repay earlier investors until the scheme collapsed due to the lack of new investor funds.

7.      Once the Plaintiff and Class Members deposited their money with PENSCO, it was immediately transferred to accounts owned, maintained, and/or controlled by the Fraud Promoters themselves, rendering the Plaintiff's and Class Members' SDIRA accounts without assets and

---

[2] "Fraud Promoters" is a term used by the SEC to describe individuals who devise and orchestrate Ponzi schemes to defraud innocent investors

SNYDER ♦ DORENFELD, LLP

1   totally worthless (not to mention creating a transaction prohibited by law and subjecting the

2   account holder to negative tax consequences).

3   8.   Even though the money had already been transferred and the accounts rendered

4   worthless, PENSCO charged its SDIRA account holders fees, typically based on a percentage of

5   the amount purportedly in the SDIRA account.   So Plaintiff and Class Members paid fees to

6   PENSCO over months and years, in exchange for absolutely nothing. There could be no

7   administrative and ministerial tasks performed, since there were no assets in the SDIRA accounts

8   to begin with.

9   9.   Pursuant to 26 C.F.R. 1.408-2(e)(5)(ii)(E), PENSCO (because it acted as a

10  Trustee/Custodian) was obligated to report annually the fair market value of the SDIRAs under its

11  management to the SDIRA owners and the IRS.  PENSCO, however, failed to ascertain the actual

12  value of the SDIRAs owned by Plaintiff and the Class Members.  Instead, PENSCO reported the

13  same value each year, unless the Fraud Promoters provided a greater value in which case PENSCO

14  reported the increased value to the victim; or, alternatively, if PENSCO became aware that an

15  investment promoter was under investigation by the Securities and Exchange Commission or some

16  other state or federal regulatory agency, then PENSCO unilaterally devalued all SDIRAs of their

17  clients holding investments with that Fraud Promoter, such as Plaintiff, to less than $5 (this after

18  claiming that it had no duty to determine fair market value in the first place).  For good measure,

19  PENSCO then resigned as Custodian.

20  10.   This unilateral devaluation occurred even though under PENSCO's own contract,

21  only the SDIRA owner could provide valuation of assets in the SDIRA; and in the contract

22  PENSCO categorically denied responsibility to determine the fair market value of SDIRA assets.

23  11.   PENSCO advertised and marketed for customers *in concert with unlicensed and*

24  *unregistered investment sponsors*, despite contract language and disclaimers disavowing

SNYDER ♦ DORENFELD, LLP

investment advice and despite the fact that PENSCO had placed similar disclaimers on all of its websites.   For instance, Ponzi Schemer Robert Stinson, Jr. and his Life's Good S.T.A.B.L. Mortgage Fund, LLC,  in November of 2007 conducted an *investment webinar for PENSCO* which included a  *PowerPoint presentation which was placed on the website of PENSCO*.  This is but one example of Defendant willfully and purposefully ignoring its own policies, practices, and procedures (as well as controlling laws and regulations applicable to SDIRA Custodians).  The purpose of this willful and intentional ignorance was to facilitate frauds against Plaintiff and the Class Members.  Some of the additional ways through which PENSCO violated its own policies, practices, and procedures and/or controlling law include:

a. Ignoring its duties as mandated by law, including but not limited to the Internal Revenue Code and the Code of Federal Regulations;

b. Trying to delegate and shift its own duties to the client (thus purportedly insulating and exculpating itself), such as making certain that there were no transactions prohibited by law.  When the Defendant learned about "Prohibited Transactions," (meaning SDIRA asset purchases that were illegal under §4975 of the *Internal Revenue Code*), they kept quiet and never informed the client such as Plaintiff and the other Class Members; nor did PENSCO advise Plaintiff and the Class Members that their SDIRAs were subject to penalties and void;

c. Depositing account holders' money directly into accounts owned and controlled by Fraud Promoters in violation of Internal Revenue Code §4975;

d. Failing to properly set forth and report to the Plaintiff and Class Members and the IRS the fair market value of assets within the SDIRAS, as required by law (*e.g.*, Internal Revenue Service Regulation 26 C.F.R. 1.408-2(e)(5)(ii)(E)).  This regulation requires

SNYDER ♦ DORENFELD, LLP

1    that Trustee/Custodian determine the value of the assets held by it in trust at least once

2    in each calendar year and no more than 18 months after the preceding valuation.

3        12.    In this case, PENSCO was required annually to ascertain and report the fair market

4    value of the SDIRAs under its management on Form 5498 *under penalty of perjury* to the IRS and

5    Plaintiff and the Class Members.  PENSCO'S failures to abide by these laws, rules, and regulations

6    created the illusion that the subject investments were providing substantial returns and/or that the

7    value of the SDIRAS was stable.  In fact, the Fraud Promoters had absconded with the investment

8    monies within days or weeks after the SDIRA funds were wired to bank accounts controlled by the

9    Fraud Promoters.

10

11

12                          **II.  JURISDICTION AND VENUE**

13        13.    The Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332 (d)

14   (2) and the Class Action Fairness Act.  Plaintiff and  Defendant are citizens of different states.  The

15   amount in controversy exceeds $5,000,000, exclusive of interest and costs.

16        14.    This Court has personal jurisdiction over Defendant pursuant to, *e.g.*, 18 U.S.C. §

17   1965, the due process clause of the U.S. Constitution, and the Code of Civil Procedure § 410.10.

18        15.    Venue in this district satisfies the requirements of 28 U.S.C. §1391 (b) (1)-(2)

19   because Defendant and some Class Members reside in this jurisdiction.

20        16.     At all relevant times, PENSCO has engaged in "interstate commerce" by

21   advertising, soliciting, offering, or distributing a good or service by soliciting consumers within the

22   definition of California *Business and Professions Code* § 17200, *et seq.*

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

### III.   THE PARTIES

17.     Plaintiff Emmanuel "Manny" Grant ("Grant") is a resident of Lanham, Maryland. Grant invested approximately $783,775 in a fraudulent enterprise resulting in a total loss of his inv*estment.*

18.     Defendant PENSCO is a privately held trust company chartered by the state of New Hampshire with its principal place of business in San Francisco, California.  PENSCO touts itself as a "premier self-directed IRA custodian" with "unmatched expertise and experience" that helps its investors "accelerate wealth" and provides its investors with "detailed asset reporting." PENSCO claims, as a "regulated banking company" to have over $10 billion in assets under custody and over 57,000 clients.

19.     Certain other individuals and entities who were involved in the fraudulent enterprises that damaged Plaintiff and the Class Members are not sued because they are fugitives, under criminal investigation or already in prison or their assets are being pursued by a trustee/receiver, or further collection efforts would be fruitless.


### IV.   THE LAW REGARDING SDIRAS

15.     SDIRAs permit non-traditional investments in alternative assets (such as tax lien certificates, promissory notes, real estate, businesses, and LLCs). Both 26 C.F.R. 1.408-2 (e)(6) and IRS Publication 590 require that a SDIRA be a trust or custodial account created as a written instrument set up in the United States for the *exclusive benefit* of the owner and beneficiaries and that the SDIRA must be maintained as a "domestic trust" at all times.

16.     There are two classifications of entities permitted by law to hold and administer SDIRA assets.  Those entities are:

a.   banks and financial institutions, both depository and non-depository, such as credit unions, and savings and loan associations, etc. as defined in 26 U.S.C. § 408 (n) and 26 U.S.C. §581 ("Bank Trustees/Custodians"); or, alternatively

b.   other entities that apply for permission to serve as a trustee/custodian and are reviewed and approved by the Commissioner of the Internal Revenue Service as able to perform the duties of a Trustee/Custodian pursuant to the requirements of section 408 and 26 C.F.R, 1.408-2 ("Non-Bank IRS Approved Trustee/Custodian").

17.   **Both Bank Trustees/Custodians and Non-Bank IRS Approved Trustees/Custodian (collectively referred to herein as "Trustees/Custodian") must comply with all applicable provisions of 26 C.F.R. 1.408-2.  Both Bank Trustee/Custodians and Non-Bank Trustee Custodians are considered Trustees** under 26 CFR 1.408 (b) (2) which states:

"(2) Trustee. (i) The trustee must be a bank (as defined in section 408(n) and the regulations thereunder) or another person who demonstrates, in the manner described in paragraph (e) of this section, to the satisfaction of the Commissioner, that the manner in which the trust will be administered will be consistent with the requirements of section 408 and this section."

18.   In order to be approved by the IRS, Non-Bank IRS Approved Trustees/Custodians must be able to demonstrate that they can perform the same duties as Bank Trustees/Custodians pursuant to 26 C.F.R. 1.408-2 (e)(6), such as: the ability to act *within the acceptable rules of fiduciary conduct*, proof of diversity of ownership to meet business continuity requirements, an established business location, *fiduciary experience and evidence of fiduciary expertise*, a high

SNYDER ♦ DORENFELD, LLP

degree of solvency, the capacity to account for the interests of a large number of individuals, the fitness to handle funds including to collect income, to execute ownership certificates,  to collect matured principal,  to give proper notification of defaults on principal and interest, the maintenance of certain net worth requirements, and the ability to maintain of records establishing and closing accounts.

19.    Any Trustee/Custodian, who claims to be passive, is *prohibited* from offering investment advice or making investment decisions; passive Trustees/Custodians may act solely as conduits through which SDIRA accounts are administered.

20.    Pursuant to 26 C.F.R. 1.408-2 (e)(6), *a Trustee/Custodian is <u>passive only if under the written trust instrument the Trustee/Custodian has no discretion to direct the investment of the trust funds or any other aspect of the business administration of the trust</u>*; the Trustee/Custodian but is merely authorized to acquire and hold particular investments specified by the trust instrument. Trustees/Custodians are also required to maintain custody of the paperwork proving ownership of a designated asset by the SDIRA.

21.    SDIRAS also have restrictions and limitations on what transactions are allowed, and how they are performed.  In order to determine if a SDIRA transaction is compliant one must analyze: (a) the qualifications/licensing of the SDIRA Trustee/Custodian; (b) the transaction itself reflecting who received the SDIRA investment; and (c) whether the type of investment is permitted.

a.    Who can be a SDIRA Custodian:

i.    As discussed above, there are two types of custodians either Bank Trustee/ Custodians (26 U.S.C. § 408 (n) and 26 U.S.C. §581) and Non-Bank IRS Approved Trustee/Custodians who have been approved by the IRS as able to perform the requirements of section

408 and 26 C.F.R., 1.408-2 ("Non-Bank IRS Approved Trustee/Custodian").

    ii.   Regardless of which category they may fall into Bank Trustees/Custodians and Non-Bank IRS Approved Trustees/Custodians (collectively referred to herein as "Trustees/Custodians") **must comply with all applicable provisions of 26 C.F.R. 1.408-2.**

    iii.   **So Custodians can only (lawfully) serve as Custodians if they fulfill their duties under these statutes (such as 26 C.F.R. 1.408-2.), including passivity, verification of assets, maintenance of assets and title documents, and determining and reporting fair market value).  If a person or entity cannot serve as a proper and lawful custodian, then any transaction it completes is illegal and void *ab initio*.**

b.   Who may receive SDIRA investment monies:

    i.   Persons who are not "Disqualified" pursuant to the *Internal Revenue Code*

       1.   A "Disqualified Person" (who cannot receive SDIRA a*ssets under Internal Revenue Code* § 4975 (e)(2)) extends to a variety of persons, in*cluding the SDIRA owne*r, an owner of 50% or more of the investment entity receiving the SDIRA funds, the investment sponsor/advisor, and persons providing services to the SDIRA (such as the Trustee/Custodian or

record-keeper).  A Disqualified Person also includes a plan (IRA or SDIRA) Fiduciary under *Internal Revenue Code* § 4975 (e)(2)(A)).  This is critical because pursu*ant to, e.g., 26 C.F.R.* 1.408-2 (e)(6), *Internal Revenue Code* § 4975 (e)(3)(A), *and* (See Advisory Opinion, 93-33*A, Internal Revenue Co*de, December 16, 1993.), **PENSCO is a fiduciary**, based, *inter alia*, on its unfettered discretion t**o control certain ass**ets of th*e Plaintiff*'s and Class Member's SDIRA monies.  **A person or entity with investment discretion over the assets in the IRA is a fiduciary and also a Disqualified Person (See Exhibit #2, "Prohibited Transaction Basics" from www.pensco.com/learn/prohibitedtransactions** ).

2. Disqualified Persons are required by 26 U.S.C. § 4975 to file form 5330s when it is learned that a SDIRA has engaged in a Direct Prohibited Transaction.

3. This notification triggers tax penalties and other sanctions associated with Direct Prohibited Transactions (see below).

4. Among other negative consequences, *Internal Revenue Code* § 4975 (a) imposes a fifteen percent (15%) tax on the amount involved in any Prohibited Transaction involving a Disqualified Person.  Further, *SDIRAs with Prohibited Transactions cease to be SDIRAs at all, (retroactively) as of the first day of the calendar year the Prohibited Transaction*

SNYDER ♦ DORENFELD, LLP

*occurs pursuant to 26 U.S.C. § 408(e)(2)(A).*  Therefore the fair market value of the SDIRA will be considered fully distributed and the account holder and they will be taxed accordingly.

    c.   What investments are permitted:

        i.   Investments are permitted where they are not a "Direct Prohibited Transaction" pursuant to *Internal Revenue Code §* 4975.   A Direct Prohibited Transaction involves the direct or indirect sale, exchange, or leasing of property, the direct or indirect lending of money, and the direct or indirect providing of goods or services between a SDIRA and a "Disqualified Person" A Direct Prohibited Transaction also includes the direct or indirect transfer of income by a SDIRA to a "Disqualified Person."

22.    *.Internal Revenue Code* **Section 4975 (e) (3) (A) defines a fiduciary of the plan (SDIRA) as**:

    a.   any person who exercises any discretionary authority or discretionary control regarding management of such plan;

    b.   and/or renders investment advice for a fee either directly or indirectly with respect to moneys in the plan;

    c.   or has the authority or responsibility to do so;

    d.   and/ or exercises any authority or control regarding management or disposition of its assets;

SNYDER ♦ DORENFELD, LLP

*e.*        and/or has *any discretionary authority or responsibility in the administration of the plan.*

23.        *A person or entity with investment discretion over the assets in the SDIRA is a fiduciary and also a Disqualified Person. (See Advisory Opinion, 93-33A, Internal Revenue Code, December 16, 1993.).*

24.        *The crux of this case relates to the  fact that PENSCO engaged in Direct Prohibited Transactions and self-dealing from the outset,* robbing the Plaintiff and Class Members not only of the tax benefits they would otherwise receive, but also robbing them of their life-savings *as well.* *PENSCO ignor*ed the obligations and duties imposed upon it by law as a fiduciary (frequently pretending that the obligations or duties did not apply to it, all the while knowing they did apply).

25.        Trustees/Custodians must report the accurate fair market value of the SDIRA assets under their management annually on IRS Form 5498 and report the value of any distributions to the SDIRA owner on Form 1099-R**.**  See Internal Revenue Manual Section 4.72.18.3.3 (11).

26.        The Internal Revenue Service issued IRS Interpretive Letter EP: R: 9 dated February 23, 1993, answering questions related to the valuation of alternative assets in an IRA. The IRS reiterated in that Interpretive Letter that it **required the IRA trustee/custodian/issuer to report the correct fair market value of the assets it holds annually and that the trustees/ custodians/ issuers of IRAs were responsible for properly valuing the assets of the IRA**. This IRS Interpretive Letter also states that "**the IRA trustee or issuer cannot evade valuation responsibility by having the participant sign a release, indemnification or other instrument, because the trustee's or issuer's responsibility for valuation derives from the IRS reporting requirements which *cannot be waived* by participant action**." See, IRS Interpretive Letter EP: R: 9, 2-23-93 (emphasis added).

SNYDER ♦ DORENFELD, LLP

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 12-cv-06084-WHO

27.     The Instructions for Form 5498 state: "Trustees and custodians are responsible for ensuring that all IRA assets (including those not traded on established markets or with otherwise readily determinable market value) are valued annually at their fair market value." [See 2013 Instructions for Forms 1099-R and 5498 published April 12, 2013 by the Department of Treasury, Internal Revenue Service (Cat. No. 27987M)].

28.     Each Form 5498 is filed with an IRS Form 1096. Form 1096 requires that the filer (here the Trustee/Custodian) sign under penalty of perjury that the information contained within the attachment is true, correct and complete.  In other words, the information contained within in each Form 5498 prepared by the Trustee/Custodian, including the reported fair market value of the SDIRA assets, is provided by the Trustee/Custodian under penalty of perjury. These requirements were implemented by the IRS for issuers and trustees of IRAs in June of 1987 per Internal Revenue News Release 87-70.   Pursuant to, *e.g.*, 26 C.F.R. 1.408-2 (e)(6), Custodians **(whether bank custodians or non-bank custodians)** can only serve as Custodians if they fulfill their statutory duties.

## II.   PENSCO'S DISREGARD FOR THE LAW IN A NUTSHELL

29.     When Plaintiff or a Class Member deposited money into an SDIRA through PENSCO, the money would immediately be transferred to an account managed, owned, operated, or controlled by the Fraud Promoter (a Disqualified Person)[3] instead of into the actual investment.

30.     Thereafter PENSCO charged and accepted fees from Plaintiff and Class Members for purportedly administering SDIRA accounts that were illegal to begin with, held no assets, and violated the terms of its own SDIRA contract.

---

[3] PENSCO knew that the Fraud Promoters were Disqualified Persons under the *Internal Revenue Code* (*inter alia*, because the Fraud Promoter held more than a 50% interest in the investment and/or because the Fraud Promoter was the investment promoter and sponsor).

SNYDER ◆ DORENFELD, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SNYDER ♦ DORENFELD, LLP

31.     As discussed above, pursuant to 26 C.F.R. 1.408-2(e)(5)(ii)(E)), PENSCO (because it acted as a Trustee/Custodian) was obligated to report annually the fair market value of the SDIRAs and failed to properly do so.  Typically it would report the same value each year unless the Fraud Promoters provided a greater value or, where PENSCO became aware that an investment promoter was under investigation by the Securities and Exchange Commission or some other regulatory agency, then PENSCO devalued all SDIRAs of their clients holding investments with that Fraud Promoter, such as Plaintiff,  to less than $5.

32.     In the case of Grant, PENSCO devalued his account to zero ($0.00) without notifying him.  This devaluation conflicted with PENSCO'S contract, wherein it disavowed the duty to make any valuations.

33.     PENSCO also violated their claimed passivity requirements (and instead acted as a fiduciary) with regard to cash in the accounts of Plaintiff and Class Members.  PENSCO was and is a *discretionary investment manager* of all uninvested cash in the SDIRAs under its management thus assuming a fiduciary duty to Plaintiff and the Class Members.   Specifically, PENSCO gave itself authority and control over the investment of the uninvested cash including the pooled trust accounts that were assets of the SDIRAs and required that it be the sole recipient of all profits/interest obtained there from without disclosing to Plaintiff and the Class Members the amount of these additional, excessive "fees."

   a.     PENSCO decided which financial institutions the SDIRA uninvested cash would be deposited in to get the best return on investment.

   b.     When interest was earned, it did not simply get deposited into the account holder's SDIRA;

   c.     Instead, PENSCO  had unfettered discretion to charge a percentage fee on the interest earned by the SDIRA cash assets ("The fee is charged as a

percentage, as determined in the discretion of PENSCO from time to time ('the percentage'), but not to exceed a maximum per annum rate of the average daily balance of custodial account cash…")

    d.    PENSCO's contract permitted it to change the amount of the fee PENSCO took from its investment of the cash in the SDIRAs of Plaintiff and the Class Members *without providing notice* to the account holder.

34.    PENSCO's self-dealing, blatant conflict of interest and assumption of control of SDIRA assets, among other conduct, breached its fiduciary duties to Plaintiff and the Class Members.

35.    The SDIRA statements from PENSCO only indicated what **amount of** interest was deposited into the account of the client's SDIRA at PENSCO'S discretion; the statements did not advise the specific percentage or amount that PENSCO charged for its fees.

36.    These actions by PENSCO created the illus*ion that the subject inv*estments were providing substantial returns and/or that the value of the SDIRAS was stable.  In fact, the Fraud Promoters had absconded with the investment monies within days or weeks after the SDIRA funds were wired to bank accounts controlled by the Fraud Promoters, and then diverted to other accounts.

### B.    PENSCO and Plaintiff Emmanuel "Manny" Grant

37.    Plaintiff Manny Grant first became aware of a potential investment opportunity with Fraud Promoter Garfield Taylor ("Taylor") and his investment company, Gibraltar Asset Management Group, LLC ("Gibraltar"), in 2009 through a friend of Grant's that had also invested with Gibraltar. Grant had retired from Verizon in August of 2009 and was seeking an alternative

SNYDER ♦ DORENFELD, LLP

1   for his retirement savings. Grant's friend, who also was retired from Verizon, told Grant that he

2   had consistently received a 20% return on his investments with Gibraltar for over a year.

3        38.    Grant contacted Taylor to discuss a potential investment. Taylor told Grant that his

4   investment funds made preferred private placements with covered calls to reduce investment risks

5   and that was the reason Taylor was able to offer his investors a 20% return on investment through

6   the Gibraltar investment funds.

7        39.    Taylor explained to Grant that Grant could make tax free investments with Gibraltar

8   through a SDIRA, and told Grant that Grant could rollover the monies from his other retirement

9   investment accounts into a SDIRA with PENSCO. Taylor recommended PENSCO to Grant and

10  told Grant that Gibraltar already had another investment client who had invested with Gibraltar

11  through a PENSCO SDIRA.

12       40.    In August of 2009, Grant invested $100,000 cash with Taylor pursuant to a three

13  month promissory note with an interest rate of 25%.  This three month promissory note was

14  subsequently extended to June of 2010.

15       41.    Thereafter, Grant transferred $591,210.63 and $92,565.57 from his respective

16  retirement accounts to a PENSCO SDIRA.  Then in October of 2009 Grant, through his PENSCO

17  SDIRA, invested $683,776.20 with Gibraltar.  These investments were purportedly held in Grant's

18  SDIRA pursuant to promissory notes issued by Gibraltar as security for the investments.

19       42.    Grant received an account statement from PENSCO for the fourth quarter of 2009

20  reflecting that the market value of Grant's PENSCO SDIRA as of December 31, 2009 was

21  $683,776.20.

22       43.    Grant's 2010 first quarter PENSCO SDIRA account statement for the period from

23  January 1, 2010 until March 31, 2010 reflected that Grant had received $33,673.06 in interest

24  payments from his Gibraltar investments.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNYDER ♦ DORENFELD, LLP

44.     PENSCO reported Grant's SDIRA total value as $717,449.26 as of March 31, 2010.

45.     PENSCO reported the value of Grant's SDIRA as $717,014.61 as of June 30, 2010 and charged Grant a fee of $443.05 for SDIRA account administration on June 30, 2011.

46.     PENSCO did not undertake a fair market value assessment of Grant's account at any time during this period violating, *inter alia*, Internal Revenue Service Regulation 26 C.F.R. 1.408-2(e)(5)(ii)(E).

47.     In reality, Taylor had stolen Grant's money immediately upon receipt because Taylor's Ponzi Scheme was running out of cash and was using new investors monies to pay the earlier investors.

48.     Sometime in June of 2010, the SEC initiated an audit of all SDIRA accounts maintained at PENSCO that held investments with Gibraltar.

49.     Grant was unaware that his account had become worthless or that the SEC was examining Gibraltar investments through PENSCO SDIRAS until Grant received a letter (in late June of 2010 from PENSCO) advising him that PENSCO had devalued his SDIRA without further explanation and without explaining why PENSCO contractually had stated it would not determine fair market value of SDIRA assets.

50.     When Grant called PENSCO to find out why his SDIRA account had been devalued, he was told by PENSCO (the "passive" custodian) that PENSCO's records had been subpoenaed by the SEC for all SDIRAs that they maintained that held Gibraltar investments and that it was PENSCO'S policy upon learning of an SEC investigation to "zero out" the affected SDIRA accounts. This "policy" by PENSCO is directly contrary to IRS regulations requiring an independent third party appraisal of alternative assets.  So Grant's SDIRA was devalued from almost three quarter of a million dollars ($750,000) to zero ($.00) by PENSCO less than one year after Grant made the investments in Gibraltar, without any explanation from PENSCO as to the

SNYDER ♦ DORENFELD, LLP

1    basis for the valuation amount.  At this time, Grant also learned that the $100,000 cash investment

2    he had made with Gibraltar was also worthless.

3        51.    Thereafter PENSCO reported the value of Grant's SDIRA as a negative six hundred

4    fifty thousand, six hundred forty five dollars and seventeen cents (-$650,645.17) as of September

5    30, 2010; Grant's PENSCO SDIRA statement reflected that PENSCO had decreased the value of

6    Grant's two Gibraltar promissory notes which were held by the SDIRA to Zero ($.00).

7        52.    In December of 2010, Grant directed PENSCO to transfer the interest monies

8    received from Gibraltar, in the amount of $32,932.07, to Grant's other non-SDIRA retirement

9    account.

10

11        53.    In April of 2011, Grant received a notice from PENSCO that his credit card had

12    been charged $204.00 by PENSCO for SDIRA account maintenance fee on Grant's PENSCO

13    SDIRA that was valued at **zero** ($.00).

14        54.    In November of 2011, Grant received a letter from PENSCO advising him that

15    PENSCO had reduced the value of his SDIRA account to $1 and that they were going to close the

16    account without charging a termination fee but that Grant would have to pay any other outstanding

17    fees before PENSCO would close his SDIRA account.

18        55.    Then in December of 2011, Grant received a letter from PENSCO resigning as

19    SDIRA Custodian and telling Grant that PENSCO was distributing the SDIRA account holdings to

20    him and issuing a form 1099-R in the amount of $2.00.

21

22        56.    Subsequently, Grant was provided other documents by PENSCO to execute to close

23    his SDIRA account and was also contacted by a Vice President at PENSCO.  However, Grant was

24    suspicious about the intent behind the PENSCO documents purportedly provided to close his

25    SDIRA and showed them to an attorney at the SEC, who advised Grant not to sign the documents

26

27

28

because they would relieve PENSCO of any liability for the losses to Grant's SDIRA.  As a result, Grant refused to sign the documents tendered by PENSCO to close his SDIRA account.

57.     In November of 2011, the SEC charged Taylor, Gibraltar and others with running a $27 million Ponzi scheme that defrauded over 130 investors.

58.     Grant received a statement from PENSCO for the period from October 1, 2011 until December 31, 2011 indicating that his SDIRA was valued at $2.00.   The PENSCO SDIRA statement also contained a rather-ironic notation, *"Attend our upcoming free webinar, "How to Prevent, Detect and Mitigate Fraud." We'll review major red flags to help prevent fraud before it starts, and discuss how to mitigate fraud once it's suspected or detected…"*

59.     To this day, Grant has never found out what happened to his SDIRA assets or why PENSCO issued statements showing that Grant's SDIRA had been deemed worthless without contacting Grant or providing valuation information to Grant.

60.     PENSCO, as a fiduciary and trustee pursuant to section 408 and 26 C.F.R, 1.408-2 (or 26 U.S.C. § 408 (n) and 26 U.S.C. §581) had a duty to their account holders and putative account holders to disclose and/or accurately represent the material facts about its policies, practices, and procedures.

61.     Plaintiff and Class Members would not have made the subject investments with cash or through their SDIRAs if they had known the truth about PENSCO's failure to comply with controlling law and regulations applicable to SDIRA Trustee/Custodians (not to mention PENSCO'S misrepresentations).  PENSCO knew that Plaintiff and Class Members would not have invested through their SDIRA accounts or with cash nor reinvested with their SDIRA accounts or with cash had they known all of the facts which were concealed and/or undisclosed

62.     Plaintiff and the other Class Members have suffered damages as a proximate result of this fraudulent concealment, including but not limited to the money in their SDIRA accounts

SNYDER ♦ DORENFELD, LLP

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 12-cv-06084-WHO

19

1  being stolen, the money they invested in cash being stolen and payment of fees for administering

2  an account which held no assets or assets of little value.

3

4                         **VII.   CLASS ACTION ALLEGATIONS**

5

6       63.    Plaintiff brings this action on as a class action pursuant to Rules 23(a) and (b) (3) of

7  the Federal Rules of Civil Procedure on behalf of a two classes:

8           a.    The first (the "First Class") is defined as all persons or entities who (from

9                 January 1, 2006 until the present, (the "Class Period")) invested in or held an

10                investment through a SDIRA administered by Defendant PENSCO and that

11                was offered to invest, sold investments or solicited investments by the Fraud

12                Promoters.

13          b.    The second (the "Second Class") is defined as all persons or entities who

14                invested in or held an investment through a SDIRA administered by

15                Defendant PENSCO during the Class Period who had uninvested cash in

16                their SDIRAs that was invested, managed or distributed by PENSCO.

17

18      64.    Excluded from the Classes are: (a) Defendant; (b) any person who was an executive,

19  officer, employee, and/or director of Defendant; any person whose spouse, child or parent was an

20  executive, officer, employee, and/or director of Defendant; (c) any person, firm, trust, corporation,

21  officer, director or any other individual or entity in which Defendant had a controlling interest or

22  which is affiliated with any of the Defendant; (d) any independent contractor of any Defendant

23  who participated in the sale of the investment vehicles outlined herein; (e) the legal representatives,

24  agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party; and (f) those

25  persons who are named litigants or have opted into a class of persons in litigation against these

26  Defendant for similar claims.

27

28

SNYDER ♦ DORENFELD, LLP

65.     The First Class and the Second Class are each so numerous that joinder of all Class Members is impracticable.  While the exact number of Class Members can only be determined by appropriate discovery, Plaintiff believes that each Class totals over 500.

66.     Plaintiff's claims are typical of the claims of the other Members of each Class. Plaintiff and all Class Members sustained damages as a result of PENSCO's unlawful course of conduct.

67.     Plaintiff will fairly and adequately protect the interest of the Class Members and have retained counsel competent and experienced in class action litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class Members that Plaintiff seeks to represent.

68.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation make it virtually impossible for the Class Members individually to seek redress for the wrongful conduct alleged herein.

69.     Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members.  Among the questions of law and fact common to the Class are:

a.      Whether PENSCO violated 26 C.F.R. 1.408-2 (e)(6), *Internal Revenue Code* § 4975 (e)(3)(A) and/or Advisory Opinion, 93-33A, Internal Revenue Code, December 16, 1993;

b.      Whether PENSCO made false and misleading representations to Plaintiff and the Class;

c.      Whether PENSCO breached its SDIRA contract with Plaintiff and Class Members;

SNYDER ♦ DORENFELD, LLP

d.      Whether PENSCO violated its duties and obligations as a Trustee and/or Custodian by exercising authority and discretion over account holders' cash;

e.      Whether PENSCO violated 18 U.S.C. § 1962c;

f.      Whether PENSCO has violated California's Unfair Competition Law, *Business and Professions Code* § 17200, *et seq.*;

g.      Whether Plaintiff and the Class Members have sustained damages as a result of the misconduct complained of herein, and, if so, the appropriate measure thereof.

70.      Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

71.      The names and addresses of PENSCO's customers who purchased its services during the Class Period are obtainable from information in the possession of PENSCO and/or its agents.  Notice can be provided to such owners via first class mail or e-mail using techniques and a form of notice similar to those customarily used in class actions.

## COUNT I

## BREACH OF CONTRACT/RESCISSION IN THE ALTERNATIVE

72.      Plaintiff incorporates the allegations contained in all of the prior paragraphs of this First Amended Complaint as if fully set forth herein.

73.      Plaintiff pleads this Count as Breach of Contract, or, alternatively, for Rescission.

SNYDER ♦ DORENFELD, LLP

74.    Plaintiff and Class Members entered into contracts with PENSCO through which PENSCO was to provide certain administrative, ministerial, and/or custodial services and fulfill certain duties and obligations under law, in exchange for payment of fees.

75.    PENSCO breached its contract in numerous ways, including but not necessarily limited to the following:

a.    Ignoring its duties as Custodians mandated by law, including but not limited to the Internal Revenue Regulation 4.108-2(e)(5)(i) through (f), the Internal Revenue Code and the Code of Federal Regulations;

b.    Depositing account holders' money directly into accounts owned and controlled by Fraud Promoters in violation of Internal Revenue Code §4975;

c.    Failing to properly set forth and report fair market value ("FMV") of the SDIRA assets annually on IRS Form 5498 and to report the value of any distributions to the SDIRA owner on Form 1099-R  as required by law (*e.g.*, Internal Revenue Service Regulation 26 C.F.R. 1.408-2(e)(5)(ii)(E)), which requires that to determine the value of the assets held by it in trust at least once in each calendar year;

d.    Continuing to accept fees for "administering" accounts with no assets left in them;

e.    Sponsoring webinars, seminars and conferences about the safety, efficiency and profitability of investing in SDIRAs.  PENSCO also permitted Fraud Promoters to advertise their investment funds on PENSCO'S website.  These were designed to enhance the appearance of legitimacy of PENSCO'S services; and

SNYDER ♦ DORENFELD, LLP

1

2
      f.     Sending out knowingly false and inaccurate investment account statements and Form 5498s without verifying the fair market value of the SDIRA.

3

4
76.    As a direct and proximate result of PENSCO'S acts and omissions as described herein, Plaintiff and Class Members suffered damages in excess of the jurisdictional minimum of this Court.

5

6

7
77.    Plaintiff and the Class Members paid thousands of dollars to Defendant as consideration for these agreements. Plaintiff and the Class Members thus alternatively seek rescission of these agreements.

8

9

10
78.    Plaintiff and the Class Members would not have entered into these agreements if they had known that:

11

12
      a.     their SDIRA investments were illegal as Prohibited Transactions with "Disqualified Persons";

13

14

15
      b.     Plaintiff's and the Class Members' SDIRA accounts were not safe and were not properly administered by licensed, approved and/or compliant SDIRA Trustees/Custodians;

16

17

18
      c.     Defendant did not and would not ascertain and report to the IRS and the Plaintiff and Class Members the accurate fair market value of any assets in Plaintiff's and the Class Members' SDIRA accounts despite being mandated to do so by law;

19

20

21

22

23
      d.     Defendant was a trustee/fiduciary of all PENSCO SDIRAs –PENSCO had sole investment discretion as to the SDIRA cash assets under its management and determined how much of the interest earned by Plaintiff and the Class Members it kept as an undisclosed additional fee and how much was given to Plaintiff and the Class Members.

24

25

26

27

28

SNYDER ♦ DORENFELD, LLP

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 12-cv-06084-WHO

24

79.     Plaintiff and the Class Members received no actual consideration for these agreements, only unfulfilled promises, terrible financial losses, and negative tax consequences.

80.     Plaintiff and the Class Members would not have entered into these agreements had they known that Defendant's consideration would be illusory and would fail.

81.     As a result, Plaintiff and Class Members seek rescission of these agreements.

82.     Plaintiff has no adequate remedy at all and will suffer irreparable harm if the agreement with Defendant is not rescinded and all of the fees paid by Plaintiff and the Class Members (including the interest received by Defendant on uninvested cash assets), to Defendant is not returned.

**COUNT II**

**UNFAIR COMPETITION**

(***Business and Professions Code* § 17200** *et seq.*)

83.     Plaintiff incorporates the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

84.     California *Business and Professions Code* § 17200, *et seq.*, prohibits acts of "unfair competition," including any unlawful, fraudulent or deceptive business act or practice, as well as "unfair, deceptive, untrue or misleading advertising."

85.     This is a private Attorney General action brought by Plaintiff on behalf of the Classes and on behalf of the general public.  As detailed herein, PENSCO has engaged in a pattern and practice of uniformly misrepresenting and/or repudiating its contractual and legal obligations.

86.     PENSCO's deliberate acts of misrepresentation as to its duties and responsibilities as a Trustee/Custodian without regard to Plaintiff's legal and equitable rights constitute acts of

1    unlawful, unfair or deceptive business acts and practices that are injurious to the public within the

2    meaning of California's Unfair Competition Law.

3          87.    PENSCO, at all times material hereto, has engaged in "trade or commerce" by

4    advertising, soliciting, offering or distributing a good or service by soliciting consumers within the

5    definition of California Business and Professions Code § 17200 *et seq*.

6          88.    The conduct of PENSCO is of a continuing nature that requires prompt relief.

7          89.    PENSCO has uniformly represented to the general public through its representatives

8    that its actions were and are legally appropriate when in fact they were not.  In addition and/or in

9    the alternative, PENSCO has concealed material facts.  Plaintiff and Class Members did (and

10   members of the general public are likely to) rely on PENSCO'S misrepresentations and omissions,

11   since PENSCO was not only the party of superior knowledge, but also the party in control of that

12   knowledge.

13         90.    Plaintiff and the Class Members have suffered, and continue to suffer, actual injury

14   in fact due to the willful acts of PENSCO that are contrary to the public policy of California, are

15   substantially injurious to consumers of California and constitute unfair trade practices and

16   competition under Section 17200, *et seq.* of the California *Business and Professions Code*.

17         91.    Based upon the obligations imposed upon PENSCO and its experience in the

18   industry, PENSCO either knew, recklessly disregarded, reasonably should have known or was

19   obligated under the law to provide correct, compliant, and prompt information on the SDIRAs

20   owned by Plaintiff and the Class Members. PENSCO failed to do so. In addition, PENSCO

21   charged excessive and hidden fees without disclosing same to Plaintiff and the Class Members.

22   PENSCO also unilaterally and illegally controlled the uninvested cash in all SDIRAs under its

23   management. As a result, Plaintiff and the Class Members were subjected to unlawful, unfair

SNYDER ♦ DORENFELD, LLP

and/or fraudulent treatment and PENSCO was unjustly enriched and should be ordered to pay restitution pursuant to Business and Professions Code §§ 17203 and 17204.

92.     Members of the general public also face irreparable harm, such as, *inter alia*, not being fully informed of the true facts, choosing to invest based on misinformation and concealment of material information, not having the full value of any monies wrongfully received or saved provided to them, being charged excessive or hidden fees, suffering the negative consequences and/or penalties of the inaccurate reporting of SDIRA values..

93.     Equitable relief is appropriate to ensure adequate controls are in place to remedy the wrongful acts, prevent recurrence, and apprise the public of the true facts regarding PENSCO'S acts and omissions and what transpired.  Pursuant to California *Business and Professions Code* § 17203, Plaintiff is entitled to preliminary and permanent injunctive relief ordering PENSCO to cease this unfair competition, as well as disgorgement of all of its profits associated with this unfair competition.

94.     Plaintiff and the Class Members seek an order from this Court prohibiting PENSCO from engaging or continuing to engage in the unlawful, unfair, and/or deceptive business acts or practices set forth in this Complaint and/or ordering that PENSCO perform its obligations under the law and reimburse Plaintiff and the Class Members all monies owed them as alleged in this Complaint.

95.     Plaintiff and the Class Members additionally request an order from this Court requiring that PENSCO make restitution of profits and return or pay to Plaintiff and the Class Members all of PENSCO's ill-gotten gains obtained from its illegal transactions and Ponzi schemes and/or pay restitution, including the amount of monies that should have been paid had PENSCO complied with its legal obligations, or, as equity requires.

SNYDER ♦ DORENFELD, LLP

96.     The above-described unlawful, unfair or fraudulent business acts and practices engaged in by PENSCO continue to this day and/or present a threat of irreparable harm to the general public.  PENSCO has failed to publicly acknowledge the wrongfulness of its actions and provide the complete relief required by the statute.

97.     Pursuant to California Business & Professions Code §17203, Plaintiff, on behalf of the general public, seeks a temporary, preliminary and/or permanent order from this Court prohibiting PENSCO from continuing to engage in the unlawful, unfair, or fraudulent business acts or practices set forth in this Complaint and from failing to fully disclose the true facts as set forth herein, and or ordering PENSCO or its representatives to stop misleading the public and engage in a corrective campaign, particularly in light of the public misperception created by PENSCO and/or its representatives' misstatements and omissions of material fact, as well as provide appropriate equitable monetary relief as the court deems just and appropriate to all persons with a vested interest therein.

98.     Plaintiff further requests a court order that an asset freeze or constructive trust be imposed over all monies in PENSCO's possession which rightfully belong to Plaintiff and the Class Members.

99.     Plaintiff requests judgment and restitution and/or disgorgement from PENSCO in an amount to be proven at trial for the unfair, fraudulent and illegal business practices described herein.

///

///

///

///

///

SNYDER ♦ DORENFELD, LLP

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff, on behalf of himself and all others similarly situated, demands upon PENSCO for:

1.      An Order certifying the case as a class action;

2.      An Order appointing Plaintiff as the Class Representative of the First and Second Classes;

3.      An Order appointing undersigned counsel and each of their respective firms as counsel for the Class;

4.      Compensatory damages, punitive damages, statutory penalties, restitution and/or disgorgement in an amount to be proven at trial;

5.      Injunctive relief;

6.      An order that a constructive trust be imposed over all monies in PENSCO's possession which rightfully belong to Plaintiff and/or an asset freeze of monies belonging to PENSCO;

7.      Attorney's fees, costs and expenses;

8.      Pre and post-judgment interest as allowed by law;

9.      An award of taxable costs; and

10.     Any and all such further relief as this Court deems just and proper.

///
///
///
///
///
///

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 12-cv-06084-WHO

SNYDER ♦ DORENFELD, LLP

29

1

## DEMAND FOR JURY TRIAL

2
3

Plaintiff, individually and on behalf of the Class Members, hereby demands a trial by jury

as to all issues so triable as a matter of right.

4
5
6

Respectfully Submitted,

7

Dated:  October 18, 2013                        CATHY JACKSON LERMAN, PA

8
9

By:  ____s/ Cathy J. Lerman_____
                    *Cathy J. Lerman*

10
11

CATHY JACKSON LERMAN, PA
Cathy J. Lerman
CLerman@Lermanfirm.com
#118, 1440 Coral Ridge Drive
Coral Springs, FL 33071
Telephone: (954) 332-1143
Facsimile:  (954) 805-2351

12
13
14

SNYDER ♦ DORENFELD, LLP
David K. Dorenfeld, (State Bar No. 145056)
DavidD@sd4law.com
Michael W. Brown, (State Bar No. 205380)
MichaelB@sd4law.com
5010 Chesebro Road
Agoura Hills, CA 91301
Telephone:  (818) 865-4000
Facsimile:   (818) 865-4010

15
16
17
18
19

*Attorneys for Plaintiff*

20
21
22
23
24
25
26
27
28

SNYDER ♦ DORENFELD, LLP

FIRST AMENDED CLASS ACTION COMPLAINT                                         30
Case No. 12-cv-06084-WHO